In the United States District Court
Northern District of Texas
Lubbock Division

| | | |
|---|---|---|
| Catherine Brower | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| Lubbock County Hospital District | § | |
| d/b/a University Medical Center | § | |
| | § | |
| | § | |
| Defendants. | § | |

## Plaintiff's Original Complaint

Plaintiff Catherine Brower ("Brower" or "Plaintiff") files this Original Complaint against Lubbock County Hospital District d/b/a University Medical Center and shows:

### Parties

1. Plaintiff Catherine Brower is an individual citizen of Texas and a resident of Lubbock County, Texas.

2. Defendant Lubbock County Hospital d/b/a University Medical Center ("UMC") is a local government entity, a hospital district in Lubbock County, Texas. It may be served with process by serving its President and CEO, Mark Funderburk at 602 Indiana Avenue, Lubbock, Texas 79415.

### Venue and Jurisdiction

3. Venue is proper in Lubbock County, Texas because the events establishing the

claims occurred in Lubbock County, which is in the Northern District of Texas.

4. This Court has federal jurisdiction over the claims asserted under the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq. and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.*

## Summary of Claim

5. UMC discriminated against Brower because of her disabilities and age and retaliated against Brower after she engaged in protected activity. Brower sues for disability discrimination, age discrimination and retaliation.

## Factual Background

6. UMC hired Brower on August 6, 2015 as a Staff Nurse in the Surgical Testing and Registration (STAR) Center. In that role, Brower performed pre-admission activity for patients who would be receiving outpatient surgery.

7. As a Staff Nurse in the STAR Center, Brower met with patients, typically a day or so before the scheduled surgery. Brower interviewed the patients, asked them a list of questions and gathered medical history and medication history. Brower may also have performed a short physical assessment of a patient, such as taking the patient's blood pressure. However, the "hands on" physical assessment was very limited.

8. As a Staff Nurse in the STAR Center, Brower typically sat across a desk and three to four feet away from the patients as she gathered medical information. Brower would only get close to a patient for a few moments, such as during a blood pressure reading.

9. Brower is an excellent nurse and has been recognized by her peers for compassion, excellent, integrity, honesty and teamwork.

10. UMC has awarded Brower the UMC Always Nurse Award four times. This is an honorary award given to a select few based entirely on patient satisfaction, patient experience, and exceeding patient expectations. Brower received this award from UMC in Q2 and Q3 of 2018, August 2019 and February 2020.

11. On March 16, 2020, UMC suspended all non-essential surgical procedures as part of the COVID-19 pandemic response. UMC assigned Brower to monitor hospital entrances on March 18 and 19, 2020. Brower took the temperatures of persons going into UMC and required them to use hand sanitizer.

12. On March 19, 2020, UMC assigned Ms. Brower to work in its COVID-19 call center from March 20, 2020 through a date in April 2020.

13. On April 7, 2020, UMC, through Vern Pharr, notified Ms. Brower she and other registered nurses were being deployed to the medical/surgical units although most had not performed bedside nursing for over 20 years.

14. UMC, through Pharr and Cindy Hill, asked Brower to fill out a questionnaire to help determine her deployment destination.

15. Brower notified UMC she suffered from the disability of rheumatoid arthritis. On April 7, 2020, Brower notified Hill by email and in person that Brower had forgotten to

include on her questionnaire she was taking a biologic for her rheumatoid arthritis and is immunocompromised because of it.

16. UMC, through Pharr and Hill, told Brower there were no exceptions to putting the RNs on the floor except for pregnant women.

17. On April 13, Brower spoke with Human Resources' Karen Pennell and Sharon Doyle (the Disability Management Coordinator) to determine her options for a reasonable accommodation of alternative nursing positions due to her rheumatoid arthritis and compromised immune system.

18. UMC, through Doyle, told Brower that Doyle did not have nor know of any alternative positions. Though Doyle is UMC's Disability Management Coordinator, Doyle said it is "not [Doyle's] job" to keep up with job listings. Doyle said that Brower was the first person to come to them with such an accommodation request.

19. In the conversation, Brower mentioned the ADA and how it helps employees. Brower then asked about an accommodation. Doyle told Brower that Brower would need to get information from Brower's doctor stating that she had a disability. Doyle added, "We are learning on you. We've never had this before."

20. Until Brower brought up the ADA, UMC, through Doyle, never mentioned it as a possible option. Brower asked Doyle if there was a specific form for the ADA to ask for an accommodation. Doyle reluctantly admitted UMC had an ADA policy and a form but said she could not provide a copy of it to Brower because it was under

development. After Brower pressed Doyle to give her the ADA accommodation form, Doyle finally provided Brower with the UMC Health System Request for Reasonable Accommodation form.

21. On April 17, 2020, Brower returned the completed ADA accommodation request form and her doctors' notes to UMC by giving the documents to Hill, her supervisor, on April 17th, placing a copy on Pharr's desk on April 17th, and emailing Pharr to inform him on April 19th.

22. In the request for accommodation, one of Brower's doctors requested that Brower not be assigned to a position requiring direct patient care because of her disabilities and immunocompromised status. Her doctor requested that she be allowed to continue in the COVID-19 call center as that position was an excellent fit.

23. On April 17, 2020, when Brower submitted the accommodation request, the COVID-19 call center was still open. Brower could easily have continued to work in the COVID-19 call center.

24. However, UMC refused to allow Brower to continue to work in the call center. On April 24, 2020, Doyle told Ms. Brower that the "call center is completely off the table. It's a temporary job and we want you to have a permanent job."

25. UMC, through Pharr and Doyle, then placed Brower on administrative leave. They do so after telling Ms. Brower that the call center job was "completely off the

table. It's a temporary job and we want you to have a permanent job." At this time, the call center was still open.

26. UMC told Brower when placing her on administrative leave there was no job UMC could provide that would comply with the restrictions in her request for accommodation -- even though the call center was still open and complied with Brower's restrictions.

27. In the April 24, 2020 meeting, Brower repeatedly asked Pharr and Doyle if Brower could ask her doctors whether she could work in the STAR center when it reopened.

28. UMC, through Pharr and Doyle, discouraged her from doing so. Both repeatedly said that they did not see how she could work in the STAR center when it reopened because it would still involve direct patient care.

29. UMC, through Doyle, indicated that she did not know the "ethics" of asking Brower's doctors whether Brower could work in the STAR center when it reopened. Doyle said Brower's doctors would just be willing to "write whatever you want them to write." Brower objected to Doyle's making a slur that her doctors would not be honest in their medical assessment of her restrictions.

30. Finally, UMC, through Doyle and Pharr, agreed Doyle would ask Doyle's supervisor, Joe Condon, the Director of Human Resources, if Brower's doctors could submit an updated letter identifying her restrictions and addressing whether Brower

could work in the STAR Center when it reopened. Because Doyle noted multiple times she would have to talk to Joe Condon about this, Brower confirmed that Doyle would talk to Condon and then call Brower back to let her know what Condon said. Doyle did not do so.

31. When the meeting ended, it was clear that Doyle had agreed to talk to Condon and to get back with Brower when Doyle knew something from Condon.

32. UMC, through Doyle, never called Brower to tell Brower the results of any conversation with Condon and whether Brower could submit revised doctors' letters. Despite Doyle's promise to Brower, Doyle apparently never followed up with Condon.

33. Though Doyle had promised to call her, Brower attempted to follow up with Doyle several times to discover what Condon had said. Brower contacted Ms. Doyle three times during the week after the April 24th meeting and left messages. Doyle did not return Brower's calls.

34. Because Brower was waiting to hear from Doyle, Brower did not ask her physicians for an updated accommodation request that would have addressed whether Brower could work within the STAR Center.

35. Brower believes that it would have been likely that her doctor would have found such a job acceptable given that (1) she sits 3 to 4 feet away from the patient most of the time, (2) a plexiglass shield could have easily been placed on the desk separating Brower from the patient, (3) the time Brower performs any hands-on patient contact is

minimal and usually less than 5-10 minutes of any meeting. Had Brower been allowed to present those facts to her physician, Brower believes that her physician would have said that she could perform those duties.

36. Though UMC promised Brower it would discover if she could submit an updated doctor's note, it broke its promise to her. In doing so, UMC failed to engage in the interactive dialog and failed to continue to discuss possible accommodations with Ms. Brower.

37. UMC fired Ms. Brower on May 5, 2020 because it claimed it had no available positions that would meet the restrictions communicated by her physicians.

38. When UMC fired Brower, Brower was age 65. Upon information and belief, the person hired to replace Brower was younger than Brower.

39. When UMC fired Brower on May 5th, Brower reminded Pharr and Doyle they had agreed to ask Condon if she could submit updated medical information from her doctors to see if Brower could work in the reopened STAR unit. However, Pharr and Doyle failed to follow through on the promise.

40. UMC, through Pharr and Doyle, both blamed Brower for not submitting any additional information about her job restrictions. UMC said a separation of service was required immediately because Brower failed to submit additional information from her doctors.

41. Because UMC decided to fire Brower *before* the May 5th meeting, it would not have mattered if Brower had Brower provided update information from her doctor *at* that meeting. UMC had already decided to terminate and the termination documents were already prepared.

42. UMC's COVID-19 call center was still open on May 5, 2020. Brower could have easily continued to work in the call center, but UMC refused to allow her to do so. UMC claimed it needed a "permanent" solution, not a "temporary" solution.

43. When UMC fired Brower, it, through Pharr and Doyle, told Brower she could apply for long-term disability. They mentioned that a nurse in another unit had been quickly approved for long-term disability.

44. When UMC fired Brower, it, through Doyle, gave her the packet of forms to apply for long-term disability and even offered to help Brower fill out the long-term disability application forms. Both acted as if getting long-term disability benefits would be adequate compensation for Brower's loss of a job. Based on the suggestion of Pharr and Doyle, Brower applied for long-term disability benefits, but was denied because she did not meet the requirements of the long-term disability carrier.

45. Upon information and belief, UMC accommodated other nurses but refused to accommodate Brower. Two nurses, "CO" and "TM"[1] never worked on a nursing unit after surgeries were cancelled and the STAR unit was temporarily closed.

---

[1] Initials are used for the names of the nurses for privacy reasons since they are not parties to this lawsuit.

Though Pharr told Brower that the only exception to a nurse being redeployed to the floor was if the nurse was pregnant, UMC allowed exceptions for at least two nurses with disabilities. Upon information and belief, TM takes a biologic medication that is similar to the biologic medication that Brower takes. Upon information and belief, CO has back, leg and shoulder problems. If UMC could make an accommodation for those two nurses, UMC could have accommodated Brower. UMC subjected Brower to differing terms and conditions in her employment as compared to CO and TM.

46. When UMC fired Brower, it told her she was eligible for rehire.

47. Brower timely filed a Charge of Discrimination related to her termination (EEOC Charge No. 453-2020-00179). Brower asserted claims for disability discrimination, age discrimination and retaliation in her charge. Brower received her Notice of Right to Sue from the EEOC on this Charge on November 1, 2021 and timely sues.

48. After Brower had been fired by UMC, Brower continued to apply for job openings at UMC for which she was qualified.

49. On February 6, 2021, Brower applied for a position as a STAR Center nurse for UMC. This was the very position Brower had held before her termination.

50. On February 6, 2021, UMC sent Brower an email indicating that her application was being reviewed.

51. On February 8, 2021—just two days after Brower submitted her application, UMC notified Brower she had not been selected for the open STAR Center nurse position.

Upon information and belief, the person hired for this position was younger than Brower and did not suffer from disabilities.

52. Brower timely filed a second EEOC charge of discrimination due to UMC's failure to rehire her on February 26, 2021. This is Charge No. 453-2021-00712. Brower again asserted claims for disability discrimination, age discrimination and retaliation in her second Charge.

53. Brower continued to apply for additional jobs at UMC after February 2021 but was not hired for any position for which she applied. Brower was not even interviewed by UMC for any of the positions for which she applied following her termination.

54. Brower received her notice of right to sue on both of her Charges from the EEOC on November 1, 2021 and timely sues.

## Causes of Action

## Disability Discrimination under the ADAAA

55. Brower incorporates the preceding paragraphs as if restated.

56. UMC is an "employer" as defined by the ADAAA. 42 U.S.C. § 12111(5).

57. Brower is an "employee" as defined by the ADAAA. 42 U.S.C. § 12111(4). Brower was qualified to perform her job duties for UMC.

58. Brower has rheumatoid arthritis and takes a biologic treatment for her rheumatoid arthritis which suppresses her immune system. Rheumatoid arthritis is an

autoimmune disorder that substantially interferes with the operation of a major bodily function including the functions of Brower's immune system. It also interferes with her ability to walk long distances or stand for prolonged periods of time. 42 U.S.C. § 12102(1) and (2)(A) and (B). Brower has a record of an impairment and was also regarded as having an impairment under the ADAAA. 42 U.S.C. § 12102(3).

59. UMC discriminated against Brower in violation of the ADAAA in the terms and conditions of her employment because of her disability, her record of a disability and because UMC regarded Brower as disabled.

60. UMC violated the ADAAA by not reasonably accommodating the known limitations of Brower, who was a qualified individual with a disability in violation of 42 U.S.C. § 12112(b)(5)(A).

61. UMC violated the ADAAA by refusing to let Brower work in the COVID-19 call center for so long as it was open. This was an accommodation that would have fully complied with Brower's medical restrictions and was available to Brower. However, UMC refused to allow Brower to continue to work in the call center for so long as it stayed open. UMC contended that it needed a "permanent" solution even though the call center was a workable option that would have continued Brower's employment.

62. UMC violated the ADAAA by refusing to engage in the appropriate interactive dialog with Brower to discuss the appropriate reasonable accommodations after Brower asked if she could ask for an updated medical accommodation note from

her doctor that would address whether Brower could work in the STAR Center when it reopened.

63. UMC, through Doyle and Pharr, promised Brower that Doyle would discover if Condon would consider an updated request for a reasonable accommodation from Brower that would specifically address the STAR Center position.

64. UMC broke its promise and never told Brower whether it would consider an updated medical accommodation request.

65. UMC then fired Brower because it said she had not submitted an updated accommodation request and that it had no positions available for her that complied with her restrictions when it fired her even though the COVID-19 call center was still open.

66. UMC subjected Brower to disparate terms and conditions of employment by providing accommodations to two nurses. UMC exempted them from providing service on the nursing floor, but did not make the same accommodation for Brower.

67. When UMC fired Brower, it told Brower to apply for long-term disability benefits and had the application paperwork ready to give to her at the termination meeting.

68. UMC violated the ADAAA by firing Brower because of her disability, her record of a disability and because UMC regarded Brower as disabled.

69. UMC's violations of the ADAAA damaged Brower. UMC caused Brower to lose her income and benefits when it fired her in violation of the ADAAA.

70. UMC's discriminatory actions were taken with malice and/or a reckless disregard for Brower rights.

71. UMC's discriminatory actions have damaged Brower.

72. Brower seeks to recover the damages to which she is entitled for UMC's retaliation, including the recovery of her back pay, the equitable right of reinstatement or front pay, fringe benefits, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorneys' fees and costs.

### Age Discrimination under ADEA

73. Brower incorporates the preceding paragraphs as if restated.

74. UMC is an employer as defined by the ADEA, 29 U.S.C. § 630.

75. Brower, age 65 when she was terminated, is an employee covered by the ADEA. 29 U.S.C. § 630(f).

76. UMC discriminated against Brower in the terms and conditions of her employment.

77. UMC required Brower to return to a position on the nursing floor after the STAR Center was temporarily closed due to the COVID-19 pandemic. UMC told Brower there would be no exceptions to the requirement that nurses work on a nursing unit unless a nurse was pregnant.

78. However, upon information and belief, UMC made exceptions for two younger nurses, "CO" and "TM." Though those nurses were not pregnant, those two

nurses did not have to return to a position on the nursing floor. Those nurses are believed to be younger than Brower.

79. UMC subjected Brower to disparate treatment because of her age. If UMC could make exceptions for CO and TM, it could also have made an exception for Brower. It did not.

80. UMC discriminated against Brower and terminated Brower because of her age in violation of the ADEA. 29 U.S.C. § 623(a).

81. UMC's discriminatory actions were taken with malice and/or a reckless disregard for Brower rights.

82. UMC's discriminatory actions have damaged Brower.

83. Brower seeks to recover the damages to which she is entitled for UMC's retaliation, including the recovery of her back pay, the equitable right of reinstatement or front pay, fringe benefits, liquidated damages, punitive damages, pre-judgment and post-judgment interest, and her attorneys' fees and costs.

### ADAAA and ADEA Retaliation Claims

84. Brower incorporates the preceding paragraphs as if restated.

85. UMC is an "employer" as defined by 42 U.S.C. § 12203 and 29 U.S.C. § 630.

86. Brower is an employee as defined by 42 U.S.C. § 12111(4) and 29 U.S.C. §630(f).

87. Brower was qualified to perform the job duties at UMC.

88. During her employment, Brower engaged in activity protected by the ADAAA and the ADEA.

89. Brower specifically requested an accommodation under the ADAAA. Brower objected to not being provided with the accommodation of being allowed to continue to work in the then-open COVID-19 call center.

90. Brower additionally requested the accommodation of being allowed to obtain an updated medical accommodation request from her physician that would address whether Brower could work in the STAR Center. UMC promised Brower to discover if its Vice President of Human Resources would consider such an updated accommodation requested, but broke its promise to her.

91. By requesting an accommodation under the ADAAA, Brower engaged in activity protected by law.

92. UMC, through its Human Resources department, fully knew of Brower's request for an accommodation.

93. UMC fired Brower just months after she requested an accommodation and after UMC failed to engage in the interactive dialog with her about her accommodation request. UMC retaliated against Brower after she engaged in protected activity and requested an accommodation.

94. After UMC fired Brower, Brower timely filed a Charge of Discrimination asserting that she had been discriminated against by UMC because of her disabilities and her age and that she had been retaliated against.

95. When Brower filed her Charge of Discrimination, that was activity protected by law.

96. When UMC fired Brower, it told her she was eligible for rehire.

97. In February 2021, UMC advertised a position for STAR Center nurse—which was the position Brower held before she was terminated. Brower applied for the position on February 6, 2021 and received an email from UMC advising her that her application was being reviewed by UMC.

98. UMC rejected Brower's application just two days later—on February 8, 2021.

99. Brower continued to apply for other open positions at UMC for which she was qualified after February 2021.

100. UMC never once interviewed Brower for the open positions.

101. UMC retaliated against Brower for seeking accommodations because of her disabilities and because Brower filed an EEOC charge of discrimination against it.

102. UMC's stated reason for firing Brower and not rehiring her for open positions are not the reason reasons for its actions and are instead just a pretext for retaliation.

103. But for Brower's protected conduct, UMC would not have terminated Brower when it did so. But for Brower's protected conduct in filing an EEOC charge, UMC would not have refused to rehire Brower for open positions for which she is qualified.

104. UMC's action in firing Brower is an adverse employment action under the ADA. UMC's failure to rehire Brower to open positions for which she is qualified is an adverse employment action under the ADA.

105. UMC's retaliatory actions were taken with malice and/or a reckless disregard for Brower rights.

106. UMC's retaliatory actions have damaged Brower.

107. Brower seeks to recover the damages to which she is entitled for UMC's retaliation, including the recovery of her back pay, the equitable right of reinstatement or front pay, fringe benefits, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorneys' fees and costs.

## Jury Trial

108. Brower demands a trial by jury.

## Prayer

WHEREFORE, Plaintiff Catherine Brower prays this Court enter a judgment for Brower and against Lubbock County Hospital District d/b/a University Medical Center on all claims asserted against it and award such other and further relief to

which Plaintiff is just entitled.

                        Respectfully submitted,

                        /s/ Karen K. Fitzgerald
                        Karen K. Fitzgerald
                        State Bar No. 11656750
                        Fitzgerald Law, PLLC
                        8150 N. Central Expy, 10th Floor
                        Dallas TX 75206
                        214.265.9958 (direct dial)
                        (214) 367-6001 (fax)
                        karen@fitzgerald.law

                        Attorney for Plaintiff Catherine Brower